**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **MYA SARAY, LLC** | |
| Plaintiff | |
| v. | Docket No. 1:2016cv275 |
| **SAHNI'S ENTERPRISES, INC.,** | |
| **Et al.** | |
| Defendants | |

**PLAINTIFF MYA SARAY, LLC'S BRIEF IN SUPPORT OF ITS
THIRD MOTION TO COMPEL DISCOVERY**

## INTRODUCTION

Mya Saray relies on its regional distributors to dole out its high-end hookah products ("MYA hookahs") among retail stores. Its Georgia distributor, #1 Wholesale, Inc., ("One Wholesale"), aspiring to be more than simply a distributor, created three brands, "Elite," "Elate," and "Badshah" (hereafter, "OW Brands"), to sell hookahs imported from abroad.  The OW Brands include at least nine hookahs that are knock-offs[1] of Mya Saray's hookahs, including one hookah that copies both the name and product design of the Mya Saray hookah.   Sahni's Enterprises, Inc. ("Sahni") imports the hookahs that One Wholesale distributes throughout the south and Colorado, including to defendants The Hookah Hookup ("Hookah Hookup"), All Fun Gifts, Inc. ("All Fun") and Hookap-Hookah Wholesale & Distributor ("Hookap Hookah").   One Wholesale acquires its knock-offs from foreign manufacturers specializing in the creation of forgeries of high-end products.

One Wholesale once ordered hookahs in significant quantities from Mya Saray, but as it acquired knock-offs, it replaced the genuine products with knock-offs.  Retail stores, including Defendants, intermingle the OW Brands knock-offs among genuine Mya Saray hookahs.  All Fun once sold knock-offs, agreed to stop, and now once again sells the same knock-off model.

Copying Mya Saray's hookahs to dupe consumers is only the opening act of Defendants' freeriding drama.  In copying MYA hookah styles, they also copied functional aspects of Mya Saray's hookahs, which are protected by numerous patents.  To eliminate any uncertainty as to Defendants' intent, they regularly depict photographs of MYA hookahs in advertising and publicizing their knock-offs.  In some instances Defendants' retain the MYA logos in these

---

[1] Throughout this brief, "knock-off" is used in the non-legal sense of a product that is an indistinguishable copy of another well-known product. A knock-off of a registered trademark is a counterfeit.
[2] Decl. pp. 34 (Brianna), 35 (Chic), 37 (Jannat and Jay), 54 (Sweep and Swirl), 99 (Subzero)
[3] Decl. pp. 35 (Chic), 38 (Lisa), 42 (Juliana), 54 (Sweep and Swirl)
[4] Decl. p. 35 (Chic)

advertisements, in other instances Defendants' (poorly) edit the photographs to remove MYA trademarks and insert their own.

Initial Disclosures for the present action were due on August 1, 2016, and Mya Saray immediately served its discovery on that date.  Defendants' responses to the discovery were evasive and perfunctory.   All Fun at times provided legitimate answers, but One Wholesale, Sahni, and Hookah Hookup ("Sahni Confederacy"), who are all under common ownership of Gary and Winnie Sahni, made wholly non-credible claims.

Congress suggests that counterfeiters during Lanham Act litigation will often behave as counterfeiters.  *See* S. Rep. No. 98-526, at 2-3 (1984).  Nothing comes easy; records are withheld and answers are evasive.  Defendants have kicked up a fantastic cloud of dust through which answers are ambiguous and Defendants strain to find ways to deny answering questions and producing documents. The undersigned can count on one hand the Interrogatories where Defendants failed to object to undue burden and breadth.  No one explanation was ever tendered. Defendants' objections to relevance seem to be haphazard and illogical.  Defendants' answers give the impression that it need only provide "smoking guns."  If one were to attempt to reverse engineer the Defendants' business processes purely on the basis of its discovery assertions, one would conclude:

- that the Sahni Confederacy has never communicated with any outside entity throughout the entirety of its business life (because it has identified and produced no communications);
- that the Sahni Confederacy has never sold or shipped a hookah (because it has identified and produced no business or sales records, and expressed dismay that Mya Saray assumed that it would retain business records);
- that the foreign counterfeit factories and the Sahni Confederacy telepathically agreed on every design, shipment detail, product, product features, and price (because it has identified and produced no communications between itself and the foreign factories that supply its white labeled knock-offs);
- that the Sahni Confederacy does not know the prices or availability of its own hookahs (because the Sahni Confederacy has produced no price sheets for its sale and distribution

of hookahs throughout the entire life cycle of sales, from receipt of import (through One Wholesale) to sale to a consumer (through Hookah Hookup));

- the Sahni Confederacy has no employees (because the Sahni Confederacy has produced no paperwork for any sales staff or listed any employees);
- that Hookah Hookup generates no business paperwork, but retains all business records for seven year.
- no one has ever paid the Sahni Confederacy for a hookah (despite the fact Sahni's import records detail that it has imported hookahs with a shelf value of well over one million dollars).
- that Defendants packaging was the result of spontaneous creation without any input from Defendants or permissions from its foreign manufacturers (because Defendants have no master file from which its packaging is printed, even though Defendants use several distinct sources of manufacturing).

This summarizes what Defendants expect Mya Saray and this Court to believe.  Defendants' objections were sweeping and frivolous, and Mya Saray asks that this Court strike all of them – unless specifically noted otherwise in this brief.  Facially, this may sound extreme, but for Defendants that 'shotgun' objections without a single explanation, invent objections, and apply rulings that this Court never issued, there is little alternative.

## STATEMENT OF PURPOSE

This motion seeks two outcomes, one for All Fun and one for the Sahni Confederacy.  All Fun on the whole provided a legitimate range of documents, but the smokescreen of illegitimate objections obscures whether this is a complete set of documents.  Mya Saray seeks to have All Fun answer without such objections, and provide correlation to applicable documents. The Sahni Confederacy evaded all attempts at providing discovery, in terms of both answers and objections. Mya Saray seeks to have the Sahni Confederacy provide discovery or affirmatively state that it lacks the documents. The Sahni Confederacy's discovery production was so flimsy for a multi-million dollar hookah sales organization, that it would be easier to characterize the discovery

responses in terms of what was produced: approximately 240 pages, 188 of which are catalogues and website printouts, and approximately of 35 pages of redacted import records.

## STATEMENT OF FACTS

When Lewis Carroll first published *Alice in Wonderland* in 1865, the family venture that would become Mya Saray was in its second year of the hookah business.  Dkt. No. 13-1, Decl. M. Badawi, par. 3.  Mya Saray is the world's largest hookah company and it designs every hookah model in its MYA brand. Decl. M. Badawi, pars. 5, 26.  Mya Saray's hookahs are sold under its MYA trademark, and are well-



known to be a premier brand based on exceptional materials and functionality.  Decl. M. Badawi, pars. 5-8; and *see generally* Dkt. No. 13-5, Decl. R. Farran, Dkt. No. 13-6, Decl. S. Boutros, Dkt. No. 13-4, Decl. A. Sahib.  Mya Saray relies on regional distributors for distribution of its hookah products throughout the United States.

One Wholesale, from 2007 to 2015, was a regional distributor of tobacco products for Mya Saray, and from its Georgia base has distributed over 32,000 MYA hookahs and accessories throughout the eight-year relationship.  Decl. of M. Badawi, par. 19. At some point unknown to Mya Saray, One Wholesale began to acquire hookahs identical to select MYA hookahs and began to sell these knock-offs rather than the MYA hookahs that they replicate. John Doe(s), principally in China, have assembly lines dedicated to providing MYA knock-offs with agents standing by to assist with their importation.  Decl. of M. Badawi, par. 15.  The MYA brand is the

world's most counterfeited hookah brand; and the MYA QT is the world's most counterfeited hookah.  Decl. of M. Badawi, pars. 13(d), 26.

Sahni is a company specializing in acquiring and importing products into the United States.  Decl. H. Badawi, par. 6. Sahni owns One Wholesale, and as the import arm of the Sahni business constellation, presumably imports hookahs to One Wholesale. Decl. H. Badawi, par. 6. One Wholesale offers hookah products and accessories through its three house brands, that constitute the OW Brands. Decl. H. Badawi, pars. 5-6.

Mya Saray owns registered trademarks for MYA (in all forms), MYA (as stylized), as well as for the product design of the QT hookah.  Dkt. 59-2, Complaint (2nd. Amd.), par. 11, 15. Mya Saray also owns multiple common law trademarks, including the hookah product name CHIC ("CHIC") and its swirl logo ("MYA Swirl Logo"); as well as the product design of the following hookahs: BAMBINO, VENTO, GELATO, and CHIC. Complaint (2nd. Amd), pars. 15-20; and Decl. M. Badawi, pars. 10-14, 27; and *see generally* Decl. R. Farran, Decl. S. Boutros, Decl. A. Sahib. In supplying the OW Brands, John Doe(s) manufacture, Sahni imports, and One Wholesale distributes: a 'Jay' and 'Jannat' hookah that are knock-offs of the MYA QT hookah; a 'Brianna' hookah that is a knock-off of the MYA BAMBINO hookah; a 'Subzero' hookah that is a knock-off of the MYA VENTO hookah; a 'Chic' hookah that is a knock-off of the MYA CHIC hookah; and a 'Sweep' and 'Swirl' hookah that are knock-offs of the MYA GELATO hookah.  Complaint (2nd. Amd), pars. 28-32; and Decl. H. Badawi, pars. 4-5[2].  The Sweep, Swirl, Lisa, Juliana, and Chic hookahs bear the MYA Swirl Logo.  Complaint (2nd. Amd), pars. 20, 28-32, 43; and Decl. of H. Badawi, par. 5[3].  Product catalogs and advertising for the OW Brands depict the OW Brands Chic with MYA logos.  .  Complaint (2nd. Amd), pars.

---

[2] Decl. pp. 34 (Brianna), 35 (Chic), 37 (Jannat and Jay), 54 (Sweep and Swirl), 99 (Subzero)
[3] Decl. pp. 35 (Chic), 38 (Lisa), 42 (Juliana), 54 (Sweep and Swirl)

28-32; and Decl. of H. Badawi, par. 5[4].   The OW Brands Chic as purchased lacked the Swirl

Logo; instead it bore a cedar tree.   Decl. of H. Badawi, par. 4(d). Defendants' catalogs and

advertising purporting to depict the OW Brands Subzero, including those of One Wholesale and

Hookap Hookah, do not display the Subzero at all; instead, they show a MYA VENTO altered to

obscure MYA logos. Decl. of H. Badawi, par. 5[5]; Dkt. No. 11-3, Expert Declaration of G. Reis.

The OW Brands also includes a Jamila hookah.   The Jamila hookah pictured on the face

of its packaging is not the hookah within the packaging.   Instead, the Jamila box contains just

another QT knock-off.   *See generally* Dkt. No. 11-2, Decl. D. Blankenship.

Sahni purports to own Hookah Hookup, a large regional retailer of tobacco products.

Decl. H. Badawi, par. 6. With the exception of the Jamila, all OW Brands specimens depicted in

this brief were purchased from Hookah Hookup.   Decl. H. Badawi, par. 3. Knock-offs are

displayed without packaging and boxed only upon purchase.   Decl. H. Badawi, par. 3.

All Fun is a regional distributor of novelty, and other, products in North Carolina.   In

2011, Mya Saray learned that All Fun was selling a knock-off of the MYA QT hookah. When

apprised, All Fun agreed to cease selling the knock-off, and in return, Mya Saray would forbear

legal action. In late 2014, Mya Saray noticed that All Fun was *once again* selling a knock-off of

the MYA QT hookah.   Mya Saray *once again* asked them to cease selling the knock-off, and All

Fun stopped.   In late 2015, Mya noticed that All Fun was *once again* selling a MYA QT knock-

off.   The QT knock-off sold in 2014-15 was the OW Brands Jannat.   Decl. M. Badawi, par. 29.

---

[4] Decl. p. 35 (Chic)
[5] Decl. p. 99 (Subzero)

<u>**ARGUMENT**</u>

**I.  DEFENDANT'S DISCOVERY RESPONSES ARE UNRESPONSIVE**

**A.      STANDARDS OF LAW**

   **1.  The Bounds of Procedure of Discovery**

The Federal Rules provide that "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." Fed.R.Civ.P. 26(b)(1). The Rules further give courts the authority to "order discovery of any matter relevant to the subject matter involved ... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii).

It has been repeatedly held that the "discovery rules are to be accorded a broad and liberal treatment." *Hickman v. Taylor,* 329 U.S. 495, 507 (1947). However, the discovery sought must be relevant. Fed.R.Civ.P. 26(b)(1); *see also Herbert v. Lando*, 441 U.S. 153, 177 (1979) (stating that "the requirement of Rule 26(b)(1) that the material sought in discovery be 'relevant' should be firmly applied").  The test for relevancy under the discovery rules is necessarily broader than the test for relevancy under Rule 402 of the Federal Rules of Evidence. Fed.R.Civ.P. 26(b)(1) ("relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."). In striking the appropriate balance between these two tensions, "[d]istrict courts enjoy nearly unfettered discretion to control the timing and scope of discovery and impose sanctions for failures to comply with its discovery orders." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 426 (4th Cir.1996).

Parties must respond truthfully, fully and completely to discovery or explain truthfully, fully and completely why they cannot respond. *Hansel v. Shell Oil Corporation*, 169 F .R.D. 303 (E.D.Pa.1996). Gamesmanship to evade answering as required is not allowed. *U.S. v. Marshall*, 132 F.3d 63, 69 (D.C.Cir.1998); *Kalejs v. INS*, 10 F.3d 441, 463 (7th Cir.1993); *Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir .1988). The party opposing a motion to compel bears the burden of showing why it should not be granted. *Roesberg v. Johns-Manville Corp.*, 85 F.R.D. 292, 296-97 (E.D.Pa.1980); *Rogers v. Tri-State Materials Corp.*, 51 F.R.D. 234, 247 (N.D.W.Va.1970).

### 2.     Overly Broad

Rule 34 provides that a request must describe with reasonable particularity each item or category of items to be inspected. Fed.R.Civ.P. 34(b)(1)(A). Courts may find that a request is overly broad when it is couched in such broad language as to make deciding which of numerous documents may conceivably fall within its scope to be an unreasonably arduous task. *General Elec. Capital Corp. v. Lear Corp.*, 215 F.R.D. 637, 641 (D.Kan. 2003). A party resisting discovery on the basis that a request is overly broad has the burden to support its objection, unless the request is overly broad on its face. *Id*. at 640. "Mere recitation of the familiar litany that an interrogatory or a document production request is 'overly broad, burdensome, oppressive and irrelevant' will not suffice." *Momah v. Albert Einstein Medical Center*, 164 F.R.D. 412, 417 (E.D.Pa. 1996)(citations omitted). When Defendants objected on the basis of breadth without ever citing a basis, the objection is legally deficient and should be struck.

### 3.     Undue Burden

Simply "[I]ntoning the 'overly broad and burdensome' litany, without more, does not express a valid objection." *F.D.I.C. v. Brudnicki*, 291 F.R.D. 669, 675 n. 4 (N.D. Fla. 2013) *See Mead Corp. v. Riverwood Natural Resources Corp.*, 145 F.R.D. 512, 515 (D.Minn.1992). Court's typically treat them as if they were not expressed at all. *Id.* ("[T]he form boilerplate objections...are nullity.")   When relevant, the fact that discovery will be burdensome and expensive is not in itself a reason for discovery which is otherwise appropriate. *See U.S. v. Nysco Labs., Inc.*, 26 F.R.D. 159, 161–62 (E.D.N.Y.1960) and *Rogers v. Tri–State Materials Corp.*, 51 F.R.D. 234, 245 (N.D.W.Va.1970) (stating that "[i]nterrogatories, otherwise relevant, are not objectionable and oppressive simply on grounds [that] they may cause the answering party work, research and expense").The burden is on the objecting party to meet his burden of demonstrating "specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [request] is ... overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 42 (S.D.N.Y.1984).   When Defendants objected on the basis of burden without ever citing a basis, the objection is legally deficient and should be struck.


4.      **Ambiguity**

Rule 34 states that a document request "must describe with reasonable particularity each item or category of items to be inspected." Fed.R.Civ.P. 34(b)(1)(A). The test for reasonable particularity is whether the request places the party upon reasonable notice of what is called for and what is not. *Kidwiler v. Progressive Paloverde Ins. Co.*, 192 F.R.D. 193, 202 (N.D.W.V.2000).   Therefore, the party requesting the production of documents must provide

sufficient information to enable the party to whom the request is directed to identify responsive documents.  *Id.* (*citing Parsons v. Jefferson-Pilot Corp.*, 141 F.R.D. 408, 412 (M.D.N.C.1992)). A party that objects to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity. *Payless Shoesource Worldwide, Inc. v. Target Corp.*, 237 F.R.D. 666, 674 (D.Kan. 2006).  A party responding to discovery requests should exercise reason and common sense to attribute ordinary definitions to terms and phrases, and if necessary to clarify its answers, and may include any reasonable definition of the term or phrase at issue.  *Id*. at 674-75.  A respondent that does not seek clarification or indicate the unclear aspects of the requests waives its objection.  *DL v. District of Columbia*, 251 F.R.D. 38, 47 (D.D.C. 2008). When Defendants objected on the basis of ambiguity for words and phrases that are facially clear, Defendants' objections are legally deficient and should be struck.

### 5.      Relevance

Discovery under the Federal Rules of Civil Procedure is broad in scope and freely permitted. *Carefirst Of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 402 (4th Cir. 2003).  Discovery need not be confined to matters of admissible evidence but may encompass that which "appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1); *Marker v. Union Fidelity Life Ins. Co.*, 125 F.R.D. 121, 124 (M.D.N.C. 1989).  The scope of discovery must be broad in order to provide both sides with all the information necessary for proper and full litigation of all the relevant issues, as well as to eliminate surprise and to facilitate settlement. *Hickman v. Taylor*, 329 U.S. 495, 507-508 (1947).

Rule 26(b)(1) provides, in part, that discovery may be obtained "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action."

*Buffington v. Gillette Co.*, 101 F.R.D. 400, 401 (D.C.Okl. 1980).  Relevancy is broadly construed at the discovery stage of litigation and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action. *Id.*; *Miller v. Doctor's General Hospital*, 76 F.R.D. 136 (W.D.Okl. 1977); *Biliske v. American Live Stock Insurance Co.*, 73 F.R.D. 124 (W.D.Okl. 1977); *Detweiler Bros. Inc. v. John Graham & Co.*, 412 F.Supp. 416 (E.D.Wash. 1976); *U.S. v. Int'l Business Machines Corp.*, 66 F.R.D. 215 (S.D.N.Y.1974). Discovery rules are to be accorded a broad and liberal treatment. *Schlagenhauf v. Holder*, 379 U.S. 104 (1964); *Hickman v. Taylor*, 329 U.S. 495 (1947); *Barnett v. Sears, Roebuck and Co.*, 80 F.R.D. 662 (W.D.Okl. 1978). Discovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought can have no possible bearing upon the subject matter of the action. *Miller v. Doctor's General Hospital, supra*; *Marshall v. Electric Hose and Rubber Co.*, 68 F.R.D. 287 (D.Del. 1975). When Defendants objected on the basis of relevance without ever citing a basis, the objection is legally deficient and should be struck.

### 6.    Duplication

The proper response to a discovery request that "duplicates" prior subject matter is not to object on the basis of duplication, but rather reference the previously-disclosed items. *Alexander*, 194 F.R.D. at 302.  "By simply objecting to the plaintiffs' request without specifically referring to any documents already produced or describing the relevant search already performed, [Defndant] has not met her burden of demonstrating that this request is in fact "unreasonably cumulative or duplicative." *Id.*  To the extent that there is any difference is the scope of the discovery request, a discovery request cannot be said to be duplicative. *Id.* When

Defendants objected on the basis of duplication when there is a difference in scope, rather than actual duplication, the objection is legally deficient and should be struck.

### 7.    Interference with Relationship

The possibility that Plaintiff may interfere with a relationship of plaintiff is not a known basis of objection.   The closest potential basis of objection is based on "annoyance and harassment."   When Defendants objected on the basis of interference with relationship, the objection is legally deficient and should be struck.

### 8.    Privacy

Defendant objects on the basis of the privacy of its employees.  This is not a recognized basis of objection, and if it were, it would nonetheless be meritless, as (i) a protective order has been entered, and (ii) the information requested is not sensitive.  Information that it is both highly sensitive and private may be shielded from discovery.   *See McDougal-Wilson v. Goodyear Tire & Rubber Co.*, 232 F.R.D. 246, 252 (E.D.N.C. 2005)(Although contact information may not be appropriately shielded from discovery, social security numbers may be.). When Defendants objected on the basis of the privacy of employees, the objection lacks a foundation due to the existence of a protective order.

### 9.    Presupposing this Court's Application of Defendant's Legal Theories

Defendants object to answering many of the discovery requests on the theory that "laches" prevents Plaintiff's ability to inquire into certain areas of information.   In raising the objection that "laches" may narrow the scope of Defendant's discovery responses, Defendants' presuppose that this Court has endorsed the Defendant's legal theories.  This is all without the

benefit of hearing or court judgment.   A defendant that refuses to answer discovery based on the application of a legal defense usurps the role of judge. *But see Tidler v. Eli Lilly & Co.*, 95 F.R.D. 332, 334 (D.D.C. 1982)(A court may allow a party to refuse to respond to discovery when the proponent's legal theory involved a "radical departure" from settled law.). Any objection where the Defendant presupposes a ruling by this Court should be struck.

### 10.    Lack of Conformity with the Rules

Recently enacted provisions of the Rules of Civil Procedure require that a Discovery Response be accompanied by a statement indicating whether documents were withheld pursuant to an objection.   Fed. R. Civ. P. 34(b)(2)(C).   Defendants never provided any such statement. Defendants never indicated which documents apply to which Document Request responses. Defendants never even provided a response to the Document Requests subsequent to its objections.

## B.  DEFENDANT'S OBJECTIONS ARE WITHOUT MERIT

### 1.    Objections to Disclosure of Defendants' Sales Revenue Information Are Meritless.

Defendants wrongfully seek to withhold information tied to Mya Saray's damages calculations.   Trademark damages are based on three primary variables, (i) the Defendants' revenue, (ii) the Plaintiff's damages, and/or (iii) a combination of the two. The Defendants' overall revenue is an issue in this action.   Accordingly Mya Saray asked for information related to calculating Defendants' gross revenue, expenses and deductions, and Defendants' tax returns. Doc Requests No. 57-59, 64 (to Sahni and One Wholesale), 52-54, 59 (to Hookah Hookup), and 45-47, 52 (to All Fun).   The size of Defendants' counterfeiting operations is an express factor in

determining statutory damages; also, the completeness of a counterfeiter's records are often such that the most complete statement of income comes from their tax returns.   In at least four infringement cases courts have found that a defendant's tax returns are relevant when the plaintiff asks for statutory damages. *See, Coach, Inc. v. Swap Shop, Inc.*, No. 12–60400–CIV, 2013 WL 4407064 * 3 holding that " 'Defendant's corporate federal income tax returns are relevant to the issue of statutory damages under section 504(c)(1) in a copyright infringement action.' " (quoting Quackenbush Music, Ltd. v. Alana, Inc., No. 92–10687–S, 1992 WL 439746 * 2 (D.Mass. Nov.2, 1992)); *Coach, Inc. v. Hubert Keller, Inc.*, Case No. CV411–285, 911 F.Supp.2d 1303, 1310 (S.D.Ga.2012) (recognizing that if plaintiff had invoked its right to statutory damages it would be entitled to the defendant's tax returns.); *Coach, Inc. v. Visitors Flea Mkt., LLC*, No. 6:11-CV-1905-ORL-19, 2013 WL 5770598, at *2 (M.D. Fla. Oct. 24, 2013).

The damages calculation for infringement includes the total revenue less costs and deductions. 15 U.S.C. 1117(a); *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 104 (2d Cir.1999). That the costs and deductions are a fundamental component of the damages calculation that is *hardwired* into the Lanham Act damages statute did not stop Defendants from objecting.  Doc. Request No. 34 (to Sahni and One Wholesale), Doc. Request No. 30 (to Hookah Hookup), and 28 (to All Fun).  Mya Saray asked for documents showing the revenue of the Subject Products, and the deductions related to the Subject Products.   Doc. Requests No. 60-61 (to Sahni and One Wholesale), Doc. Request No. 55-56 (to Hookah Hookup), and 48-49 (to All Fun).  Defendants' objections should be struck and the Defendants should be made to answer.

2.      **Objections to Information Related to Defendants' Sales Quantities Are Meritless.**

Mya Saray asked Defendants to provide such documents as describe their inventory of hookah products. Doc. Request. No. 1 (to All Defendants).  Then Mya Saray asked for documents describing the physical location of the hookah inventories.  Doc. Request. No. 2 (to All Defendants).  The inventory of hookahs can be used, particularly in cases involving counterfeiters wherein records are loosely or evasively retained, to calculate damages. *See, e.g., Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 538 (D.N.J. 2008)(A counterfeiter's inventory is necessary for initial damage estimates.  Calculations based on product turnover times is a recognized basis to estimate damages).  Defendants' objections should be struck and the Defendants should be made to answer.

3.      **Objections to Information Related to Defendants' Distribution Are Meritless.**

Mya Saray asked Defendants to provide their import records for hookahs and hookah related products.  Doc. Request. No. 3. (to All Defendants). The importation records for Defendants' subject products are relevant to this action because they form the starting point of a damages analysis, identify the counterfeit manufacturers, and indicate quantities.  Information related to hookahs that are not the subject products indicate market context[6] in which Defendants sell their spurious products. Defendants' objections should be struck and the Defendants should be made to answer.

Mya Saray sought documents to and from third parties that advertise, publicize, and solicit orders of the Subject Products. Doc. Request No. 10 (to All Defendants). Mya Saray

---

[6] For example, Defendants may elect to import counterfeits and knock-offs because they sell quicker than products that do not imitate Mya Saray's products – or the products of a third party.

assumes that Defendants try and sell the products that they import from abroad. Defendants' objections should be withdrawn and the Defendants should be made to answer. Mya Saray sought documents related to the amounts expended on advertising and promotion, and then documents related to the effectiveness of the advertising and promotion. Doc. Requests No. 11-12 (to All Defendants). As the similarity of advertising used by markholders is a factor of likelihood of confusion, this query is highly relevant. The degree of penetration achieved by Defendants in peddling spurious goods is a basis of unfair competition damages. *See Otis Clapp & Son v. Filmore Vitamin Co.*, 754 F.2d 738 (7th Cir. 1985) (the costs of plaintiff's "curative advertising campaign" were awarded in a case of mixed false advertising and trademark infringement).

One of the most effective forms of advertising includes Internet resources. Mya Saray asked Defendants to provide copies of the Internet resources, e.g. websites and FTP resources, along with documents characterizing visits to these resources. The placement and positioning of products relative to one another indicate the commercial priorities of the seller as well as specials, deals, promotions, and other types of publicity. Instructions to the web developer bespeak the commercial context of the products sold be an infringer. Documents characterizing visits to these resources demonstrate the success of the Internet resource; for example, IP address tracking indicates geographic success, while hits demonstrate numerical success, and hits correlated to e-mail promotions indicate marketing success. Mya Saray sought documents related to these Internet activities. Doc. Requests No. 30-31 (To Sahni and One Wholesale), 26-27 (to Hookah Hookup), and 25-26 (to All Fun). Defendants' objections should be struck and the Defendants should be made to answer.

Mya Saray asked for the distribution documents of Subject Products to retailers and other distributors. Doc. Request No. 18 (to One Wholesale and Sahni); Doc. Request No. 15 (to Hookah Hookup); Doc. Request No. 14 (All Fun).  Then Mya Saray asked for documents that might summarize the distribution. Doc. Request No. 19 (to One Wholesale and Sahni); Doc. Request No. 16 (to Hookah Hookup); Doc. Request No. 15 (All Fun).  Invoices produced pursuant to this request forms the heart of Mya Saray's damages calculations, determination of infringement on a locale-by-locale basis, and the identification of retailers selling the Subject Products (including those that sell both Mya Saray's products and the Subject Products). These calculations form the heart of a counterfeit-plaintiff's damages calculations.  *See e.g. Malletier v. Artex Creative Int'l Corp.*, 687 F. Supp. 2d 347 n. 26 (S.D.N.Y. 2010)("LVM *relies* upon a series of twenty-five (25) invoices from defendants purporting to show defendants' gross sales")(emphasis added); *See Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413 (1916)(Confusion follows sales of an article rather than state/municipal boundaries).

The sales pitches that Defendants' provide retail stores as well as the assertions, representations, and warranties indicates Defendants' beliefs about their own products.  Much can be learned from sales scripts.  Mya Saray asked about documentation related to visits and communications to retail stores that sold the Subject Products.  Doc. Request No. 35 (to Sahni and One Wholesale), 31 (to Hookah Hookup), and 29.  Mya Saray then sought documents related to hiring, termination, job description, etc., of employees involved in the sales of Defendants' products.  Doc. Request No. 54 (to Sahni and One Wholesale), 49 (to Hookah Hookup), and 42 (to All Fun).  Mya Saray also sought employees related to more general functions of the companies, e.g. CEO, product design, product engineering, etc.  Doc. Request No. 55 (to Sahni and One Wholesale), 50 (to Hookah Hookup), and 43 (to All Fun). To the extent that Defendants

had any training materials related to the Defendants sales, marketing, and distribution of the Defendants products, Mya Saray sought those too. Doc. Request No. 56 (to Sahni and One Wholesale), 51 (to Hookah Hookup), and 44 (to All Fun). Defendants' objections should be struck and the Defendants should be made to answer.

The marketing and publicity of Defendants' products is at issue, particularly the effectiveness.  The effectiveness of Defendants' advertising bespeaks the degree that Defendants' have harmed Mya Saray's goodwill.  Mya Saray asked for any documents that characterize the effectiveness of that advertising. Doc. Request No. 62 (to Sahni and One Wholesale), 57 (to Hookah Hookup), and 50 (to All Fun).  It is worth remembering that the Sahni Confederacy was supposed to be selling Mya Saray's hookahs while it was selling spurious imitations of Mya Saray's products.  How meaningfully did the Sahni Confederacy attempt to fulfill its obligations?  Mya Saray sought documents related to Defendants sales efforts for Mya Saray's products. Doc. Request. No. 63 (to Sahni and One Wholesale), 58 (to Hookah Hookup).

Mya Saray sought communications and other documents between the Defendants. Doc. Request No. 17 (to Sahni and One Wholesale).  The communications between distributor and retailer (e.g., One Wholesale and All Fun), and competing retailers (Hookah Hookup and All Fun) define their understandings and intent with respect to the distribution of hookahs. Defendants' objections should be struck and the Defendants should be made to answer.

Mya Saray sought documents regarding the sales history of three categories of goods: (i) Defendants' sales of the Subject Products; (ii) Defendants' sales of hookahs; and then (iii) Defendants' sales of Mya Saray's products.  Doc. Requests No. 20-22 (to Sahni and One Wholesale).  Mya Saray did not ask the retailers, *i.e.* All Fun and Hookah Hookup, to produce

records to sales of hookahs, generally. Doc. Requests No. 17-18 (to Hookah Hookup) and 16-17 (to All Fun).   Wherever a trademark defendant distributes an infringing product, there is infringement *in that location*.[7]  *See Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413 (1916)(Confusion follows sales of an article rather than state/municipal boundaries). Furthermore, when infringing articles are sold in competition with the lawful articles, the damages analysis differs. *See Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922 (Fed.Cir.2012)(Direct competition causes price erosion).

**4.      Objections to Information Related to Defendants' Creation and Discovery of the Subject Products Are Meritless.**

Mya Saray sought third party documents, reviewed by Defendants, for the products that would be become the Subject Products. Doc. Request No. 9 (to All Defendants).  Defendants are not manufacturers, and rely on the efforts of foreign counterfeit manufacturers to supply the Subject Products.  The foreign manufacturers advertise their ability to supply counterfeits just as domestic sellers of counterfeits advertise their ability to sell them.  How these foreign counterfeit manufacturers market[8] their supply of counterfeits bears a strong relation to several of the likelihood of confusion factors (especially, for example, when the suppliers state that their products are "like MYA."). Defendants' objections should be withdrawn and the Defendants should be made to answer.

---

[7] And see Doc. Request No. 24 (to Sahni and One Wholesale), 20 (to Hookah Hookup), and 19 (to All Fun), where Mya Saray directly asks for all documents demonstrating sales by geographic region.
[8] Also, Mya Saray sought the telephone bills of Defendants in any telephone call with a foreign supplier of the Subject Products.   The telephone numbers, identity, and other evidence will allow Mya Saray to generate witnesses, conduct interviews, and otherwise lead to helpful discovery.  Doc. Request No. 33 (to Sahni and One Wholesale) and 28 (Hookah Hookup).

Knowing that counterfeit suppliers tend be turn-key affairs that supply products along with packaging and labeling, Mya Saray asked for any documents related to the "White Labeling" of the Subject Products. Doc. Request No. 14 (to Sahni Confederacy members).

### 5.     Objections to Discovery Related to Defendants' Intent are Meritless.

A Defendant's intent in intellectual property litigation can be a basis for determining unfair competition, likelihood of confusion, and enhanced patent damages. *Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 148 (4th Cir. 1998)(Intentional copying creates a presumption of secondary meaning) *see Beer Nuts v. Clover Club Foods Co*., 805 F.2d 920 (10th Cir. 1986) (The "deliberate adoption of a similar mark may lead to an inference of intent to pass off goods as those of another which in turn supports a finding of likelihood of confusion."); *Rosemount Inc v. Beckman Instruments Inc*., 727 F.2d 1540 (Fed. Cir. 1984)(Willfulness is a prominent factor in determining patent damages). Defendants objections to discovery responses based on intent should be overruled, and Defendants should be made to answer.

Mya Saray asked for documents related to Defendants selection and screening of the brand names that it uses to sell hookahs, as well as the hookahs provided thereunder. Doc. Requests No. 37-40 (to Sahni and One Wholesale), 33-36 (to Hookah Hookup), and 31-35 (to All Fun). Defendants' operating procedures for generating and stocking brands is strongly indicative of its sophistication and respect for the intellectual property rights of others. Similarly, all of Defendants' product names, how the product names were created, and how the surface designs and product designs were selected are significant choices related to intent. Doc. Requests No. 42-46 (to Sahni and One Wholesale), 38-42 (to Hookah Hookup), and 35-37 (to All Fun). The Defendants' attitude toward the legal rights of Mya Saray is a substantial

question. Doc. Request No. 47, 65 (to Sahni and One Wholesale), 43, 60 (to Hookah Hookup), and 38, 53 (to All Fun).  Wrongful intent is "easy to infer where [a] defendant knew of the plaintiff's mark, had freedom to choose any mark, and 'just happened' to choose a mark confusingly similar to plaintiff's mark." *Dreyfus Fund, Inc. v. Royal Bank of Canada*, 525 F. Supp. 1108, 1121 (S.D.N.Y. 1981); *and s*ee *Beer Nuts v. Clover Club Foods Co.*, 805 F.2d 920 (10th Cir. 1986) (The "deliberate adoption of a similar mark may lead to an inference of intent to pass off goods as those of another which in turn supports a finding of likelihood of confusion.").

If Defendants engaged in any activity to lessen the damages that they might incur based on their potential to be infringers, then Mya Saray has a right to review documents related to that activity. Mya Saray asked for such documents. Doc. Request No. 66 (to Sahni and One Wholesale), 61 (to Hookah Hookup), and 54 (to All Fun).

A defendant may appropriately object to revealing attorney advice on the confusing similarity of trademarks or the ability to vend products notwithstanding patents; however, one cannot use an attorney opinion to support a defense unless it is revealed in discovery pursuant to a legitimate request.  I*n re Seagate Tech., LLC*, 497 F.3d 1360, 1374 (Fed. Cir. 2007). Defendants may rely on attorney advice to attempt to negate willful intent and thereby waive attorney-client privilege, or Defendants may maintain the privilege, but doing so forecloses their use of such an opinion.

All Fun and its desire for a QT hookah counterfeit is pure recklessness.  Three times has All Fun offered a QT counterfeit, and the last of the three times All Fun offered the QT counterfeit subsequent to assurances from the Sahni Confederacy.  Defendants' communications and other documents providing such assurances should be discoverable – as well as the conclusions that All Fun drew from those documents that inspired All Fun to once again sell a

counterfeit.  Mya Saray asked for those documents.  Doc. Request No. 41 (to Sahni and One Wholesale), 37 (to Hookah Hookup) 34 (to All Fun).

As discussed in Section B.6 of this brief, Defendants repeatedly depicted Mya Saray's products and claimed them as their own, defaced Mya Saray's trademarks to pretend that certain hookahs originated from Defendants, and depicted Mya Saray's trademarks on Defendants hookahs.  Whether these false advertisements are negligent, malicious, or otherwise part of a purposeful plan to dupe purchasers is at issue in this litigation.  Mya Saray asked about Defendants' review process for its advertisements, as well as how such advertising is implemented for its hookahs.  Doc. Request No. 48-49 (to Sahni and One Wholesale), 44 (to Hookah Hookup) 39 (to All Fun).

### 6. Objections to the Attributes of the Subject Products and Information Related to Likelihood of Confusion Are Meritless

Defendants' Subject Products include surface designs identical to those of Mya Saray's products. Mya sought documents related to surface designs on the Subject Product surface designs. Doc. Request No. 4 (to All Defendants). The Subject Products are identical to Mya Saray products, and form the basis of Mya Saray's trademark and unfair competition claims. Mya Saray sought documents referring to the design and appearance of, the manufacture of, creation of, and the creation of packaging for the Subject Products. Doc. Requests No. 5-8 (to All Defendants).  Defendants did not believe that the product designs and packaging of products forming the centerpiece of this unfair competition litigation were relevant.  Defendants' objections should be withdrawn and the Defendants should be made to answer.

Defendant has appropriated many elements of Mya Saray's branding and other intellectual property.  To specifically address those times when Defendant intermingled Mya Sarya's branding with its own, Mya Saray sought any documents that utilized certain words associated with Mya Saray (e.g. MYA and QT) with any product of Defendants.  Doc Requests No. 25-26 (to Sahni and One Wholesale), 21-22 (Hookah Hookup), and 20-21 (All Fun).  Any portrayal of a Defendant product with a Mya Saray brand asset on, or even near, that product is an indication of unfair competition.   Defendants' objections should be withdrawn and the Defendants should be made to answer.

The quality differences between the Subject Products and Mya Saray's products are a factor of likelihood of confusion.  *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009).  Mya Saray asked for any documents characterizing differences and comparisons between Defendants' products and those of Mya Saray.  Doc. Request No. 13. (to All Defendants).  Furthermore, Mya Saray sought any documents related to returns by an end user and returns by a retailer.  Doc. Request No. 52-53 (to Sahni and One Wholesale), 47-48 (to Hookah Hookup), and 40-41 (to All Fun).

Defendants' objections should be struck and the Defendants should be made to answer.

So much can be learned from the perceptions of consumers as they communicate with an infringer.  When a consumer contacts an infringer and mentions a rights holder or an infringing product, whether for purposes of mistaken identity, product comparison, complaint, etc., this communication would inform some aspect of the infringement analysis: intent, quality, actual confusion, etc. *Pic Design Corp. v. Bearings Specialty Co.*, 436 F.2d 804, 168 U.S.P.Q. 321 (1st Cir. 1971)(actual confusion is strong evidence of confusion*); Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.*, 716 F.2d 854, n.13 (11th Cir. 1983) ("Proof of intentional copying is

evidence, but not conclusive, on the likelihood of confusion issue."). Mya Saray sought documents where a consumer or end user mentioned Mya Saray or a Subject Product, and because Mya Saray asked for documents "relating" to these communications, Defendants' redress or mitigation actions should be produced. Doc. Requests No. 27-28 (to Sahni and One Wholesale), 23-24 (Hookah Hookup); 22-23 (to All Fun). Consumers are not the only entities capable of being duped, or having opinions on the Subject Products; Mya Saray also sought documents related to communications from retailers/distributors to the Defendants. Doc. Request No. 29, 67 (to Sahni and One Wholesale), 25, 62 (Hookah Hookup); 24, 55 (to All Fun).

Much of the media used by Defendants in selling its spurious products is at issue in this litigation. In some instances, Defendants depict a Mya Saray product while pretending that it is a Defendant product; in other instances, Defendants deface Mya Saray's trademarks appearing in photographs of a Mya Saray entity and claim the product as a Defendant product; and in other photographs defendants depict a Defendant product with Mya Saray's trademarks while claiming that the product is a Defendant product. Mya Saray has a right to the media that Defendants use to publicize its hookahs. Mya Saray asked for documents related to the creation and use of media Defendants use to market their hookahs. Doc. Request No. 36 (to Sahni and One Wholesale), 32 (to Hookah Hookup), and 31 (to All Fun). Mya Saray expressly asked for the media related to specific hookahs. Doc. Requests No. 50-51 (to Sahni and One Wholesale), 45-46 (to Hookah Hookup).


Mya Saray asked Defendants to produce any records of the first sale of any Subject Product. Doc. Request No. 23 (to Sahni and One Wholesale), 19 (to Hookah Hookup), and 18

(to All Fun). The date of first sale indicates the start of the liability period, and allows Mya Saray to more accurately tailor future discovery responses.

7. The Organization of Defendants

Mya Saray sought documents characterizing the organization of Defendants' companies and whether any Agreements were in place defining company subparts and affiliates. Doc. Request. No. 16 (to Hookah Hookup and Sahni). To extent that documents falling under this Document Request would reveal the obligations of one unit with respect to another, this Document Request is highly applicable to this litigation. Defendants' objections should be struck and the Defendants should be made to answer.

8. Defendants Other Objections Are Meritless.

Mya Saray asked Defendants to produce any agreements that they have with any other Defendant. Doc. Request No. 15 (to Sahni Confederacy Members); Doc. Request. No. 69 (to Sahni and One Wholesale), 64 (to Hookah Hookup), and 57 (to All Fun). Naturally the terms of any inter-party agreements would be relevant to a host of issues: shipping terms would relate to damages; indemnification would relate to a party's sense of security in providing spurious goods; and the terms of the relationship would dictate the apportionment of damages. Defendants' objections should be struck and Defendants should be made to answer the Document Request.

Tobacco is a highly regulated industry. When Mya Saray asks for approvals, rejections, and registrations of any of the Subject Products, Mya Saray would acquire product numbers, registration numbers, and licenses that would lead to a significant amount of discoverable information. Doc. Request. No. 33 (to Sahni and One Wholesale), 29 (to Hookah Hookup), and

27 (to All Fun). Furthermore, any attempts to register trademarks or acquire patents for the Subject Products would inform the 'intent' factor of trademark infringement.   Defendants' objections should be struck and Defendants should be made to answer the Document Request.

Mya Saray then asked for a specimen of each of the Subject Products, and their packaging, for testing and evaluation, and for use as evidence.   Doc. Request. No. 68 (to Sahni and One Wholesale), 63 (to Hookah Hookup), and 56 (to All Fun).   Defendants' objections should be struck and Defendants should be made to supply the specimens.

Mya Saray sought the minutes, notes, or other documents relating to a company meeting that discussed Mya Saray or its intellectual property.   Doc. Request. No. 71 (to Sahni and One Wholesale), 66 (to Hookah Hookup), and 59 (to All Fun).   An intellectual property infringement action is not be taken lightly by a reasonable entity, and the extent to which Mya Saray's rights were discussed on a corporate level indicates the degree of seriousness to which Defendants sought to respect the rights of third parties.   Defendants' objections should be struck and Defendants should be made to supply the specimens.

Mya Saray asked Defendants to provide any reference that may constitute their bases for alleging that any patent or other intellectual property of this suit is invalid, void, or otherwise not enforceable. Doc. Request. No. 72-73 (to Sahni and One Wholesale), 67-68 (to Hookah Hookup), and 60-61 (to All Fun).   Because invalidity and unenforceability are defenses to patent infringement, this Document Request is highly relevant.   Defendants' objections should be struck and Defendants should be made to answer.

The Defendants are currently under an order from this Court that forbids any commercial exploitation of most of the Subject Products.   Defendants explained to this Court that they requested that their larger purchasers cease selling the products that are the subject of the order.

Mya Saray asked for any documents in which Defendants characterized this action or the issues of this action.  Doc. Request. No. 74 (to Sahni and One Wholesale), 69 (to Hookah Hookup), and 62 (to All Fun).  Defendants' objections should be struck and Defendants should be made to answer.

Mya Saray asked for various documents related to witness testimony, both lay and expert.  Any document that a lay witness studies in preparation or creates for this action, and any document that an expert reviews, creates, relates to the experience of the expert ought to be disclosed.  Doc. Request. No. 75-76 (to Sahni and One Wholesale), 70-71 (to Hookah Hookup), and 63-64 (to All Fun).  Defendants' objections should be struck and Defendants should be made to answer.

Mya Saray asked for all documents identified in the Document Request responses tended by Defendants.  Doc. Request. No. 77 (to Sahni and One Wholesale), 72 (to Hookah Hookup), and 65 (to All Fun).  Defendants' objections should be struck and Defendants should be made to answer.

## II.                                 CONCLUSION

Mya Saray asks that this Court order the Defendants' to respond to Mya Saray's Document Requests.  These responses should be in conformity with all rules, including with correlation to specific Document Requests and indicating documents withheld pursuant to objection. fully and without objection, except where noted above.


Respectfully submitted,

By ___/s/_____
M. Keith Blankenship, Esq.
Attorney for Plaintiff
VSB# 70027

Da Vinci's Notebook, LLC
10302 Bristow Center Dr
No. 52
Bristow, VA 20136
703-581-9562
keith@dnotebook.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 3, 2016 I have filed electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notice of such filing to the counsel of record who are registered with the CM/ECF system.


_____/s/_____
M. Keith Blankenship